**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

CHRISTOPHER L. FALCONE,

Plaintiff,

v.

THE UNIVERSITY OF MINNESOTA and THE BOARD OF REGENTS

Defendants.

Civil No. 01-1181 (JRT/SRN)

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Gregg Corwin and Amanda R. Cefalu, LAW OFFICE, P.C., 508 East Parkdale Plaza Building, 1660 South Highway 100, St. Louis Park, MN 55416, for plaintiff.

Jennifer L. Frisch and Mark B. Rotenberg, GENERAL COUNSEL OF THE UNIVERSITY OF MINNESOTA, 360 McNamara Alumni Center, 200 Oak Street, S.E., Minneapolis, MN 55455, for defendants.

Plaintiff Christopher Falcone sued the University of Minnesota Medical School ("University" or "medical school"), pursuant to the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, alleging that the University failed to provide reasonable accommodations for his disability and dismissed him solely because of his disability. The University claims that the dismissal was for academic reasons, and that Falcone is not qualified to be a physician. For the reasons discussed below, the Court finds that the University did not

FILED SEP - 3 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. SEP - 3 2003
DEPUTY CLERK

not violate the Rehabilitation Act ("the Act"), and grants defendants' motion for summary judgment.

## BACKGROUND

### I. Falcone's Background

Falcone was born with Crouzon's syndrome,[1] a condition which results in craniofacial disfigurement. He has undergone multiple surgeries to correct for the disfigurement Crouzon's causes. Those surgeries have resulted in hearing loss. Falcone also has learning disabilities including Attention Deficit Disorder.

Falcone attended the University of California at Berkeley as an undergraduate, graduating with a double major in chemistry and statistics. He then attended the University of Illinois-Champagne Urbana where he earned a masters degree in chemical physics. At both institutions, he received accommodations such as extra time to take exams and reduced course loads.

[1] WebMD provides the following information about the disorder:

> Crouzon syndrome is a rare genetic disorder that may be evident at birth (congenital) or during infancy. The disorder is characterized by distinctive malformations of the skull and facial (craniofacial) region. Such abnormalities may vary greatly in range and severity from case to case, including among affected family members. However, in most infants with Crouzon syndrome, the fibrous joints between certain bones of the skull (cranial sutures) close prematurely (craniosynostosis). In addition, facial abnormalities typically include unusual bulging or protrusion of the eyeballs (proptosis) due to shallow eye cavities (orbits); outward deviation of one of the eyes (divergent strabismus or exotropia); widely spaced eyes (ocular hypertelorism); and a small, underdeveloped upper jaw (hypoplastic maxilla), with protrusion of the lower jaw (relative mandibular prognathism)."

He then enrolled in the medical school at the University of Minnesota. At the beginning of his medical school career, Falcone registered with the University's Disability Services Office, and several accommodations were recommended and provided, as will be discussed more thoroughly below.

## II. Medical School

### A. Curriculum

The first two years of medical school are classroom years, during those years, students have only introductory exposure to patients, and little clinical experience. These years are referred to as the didactic portion of medical school.

Years three and four shift to a clinical based method of education. Students complete 52 weeks of required clinical courses during the third and fourth years.[2] Clinics are performed at various hospitals and clinics in Minnesota and are supervised by on-site physicians. Clinical rotations are designed to simulate the practice of medicine. During rotations, students interview and assess patients, synthesize data, and recommend a course of treatment based upon the presentation of any particular patient.

### B. Evaluation

Written and objective clinical examinations and other methods are used to evaluate the performance of all medical students. Students receive written and oral

[2] These 52 weeks are divided as follows: 12 weeks of internal medicine; 6 weeks each of surgery, obstetrics-gynecology, pediatrics, and psychiatry; 4 weeks of neurology; 4 weeks in surgical specialties, and an 8-week ambulatory care experience with 4 of those weeks in family practice and 4 weeks in either general medicine, general pediatrics, or geriatrics.

feedback, so that they may be informed of their progress, and take appropriate steps to improve if necessary. First and second year courses are graded on a pass or fail basis (P - N). Later courses are graded as H (honors), E (excellent), S (satisfactory), N (no credit, fail), I (incomplete).[3]

**C. COSS**

Students experiencing significant academic difficulties are asked to appear before the Committee on Student Scholastic Standing ("COSS"). Students may be dismissed from the medical school, following a hearing in front of COSS, if they have not demonstrated satisfactory academic performance or have exhibited other conduct or behavior that would prevent the individual from responsibly undertaking the duties of a physician.

Procedures for dismissal hearings are set out in the "Policies and Procedures of the Committee on Student Scholastic Standing," which notes that "[t]he hearing is intended to allow presentation of relevant facts and arguments to the Committee before a decision is reached." The Committee reviews "the student's entire overall performance in medical school and other pertinent information about that individual's qualifications to become a physician."

---

[3] The grading system has been changed, but this H through I system was in effect when Falcone attended the medical school.

## III. Falcone's Experience—Didactic Education

Falcone met with the University's Disability Services office during his first month of medical school. That office informed the medical school that Falcone needed accommodations including double time for tests, flexible deadlines, tutors to streamline the learning process, and assistance in accessing any tutorial programs in the medical school.

For the purposes of this motion, there is no dispute that Falcone received these accommodations. Nonetheless, he had serious difficulties on the first set of examinations, and was contacted by the Associate Dean regarding his poor performance. Falcone appeared before COSS on November 15, 1995. He requested additional accommodations, and requested permission to reschedule his second set of exams. That accommodation was granted. The Committee allowed Falcone to remain in medical school, but recommended that he decelerate to half-time status. At that time, the Committee also noted that Falcone needed to be able to successfully complete 80% of the courses in which he was enrolled to prevent further action by COSS, including possible dismissal. Falcone agreed to half-time status.

Despite the half-time status, and the grant of all requested accommodations, Falcone failed to successfully complete at least 80% of his attempted credits. Falcone again appeared before COSS.[4] And again, he was permitted to continue in medical school.

[4] This hearing was held on August 14, 1996.

As a result of this second appearance before COSS, Falcone received additional requested accommodations, as confirmed by the office of Disability Services. In all, his accommodations included double time and a private room for exams; a microscope and slides for home use; notes from a student co-op; and regular meetings with a mentor. Falcone eventually completed his "second year" of medical school.

## IV. Clinical Education

### A. Initial Accommodations

As he began his clinical rotations, Falcone did not request specific accommodations. However, he claims that he did approach an associate dean, and suggested that the University send a letter informing his clinical supervisors of his disability and his request for extra time. Falcone claims that the associate dean shook her head, and said "No, I don't know." The subject was then dropped. Falcone does not claim that he pursued the subject of accommodations with individual clinical faculty as he began his rotations, or with the disability counselor to whom he was assigned. He testified (at a COSS hearing) that he was unsure what accommodations he should request, and he did not want to share information about his disability with clinical faculty, because grading is so subjective. It is unclear whether his original accommodations (extra time for tests, flexible deadlines, and tutors) still applied.

### B. Pediatric Neurology

Falcone failed his Pediatric Neurology rotation in the Fall Quarter of 1998. Falcone had not requested any accommodations from his course supervisor, or from the Disability Services Center.

Receipt of a failing grade in any clinical rotation mandates an appearance in front of COSS. Falcone appeared in front of COSS on February 17, 1999, to address the failure in pediatric neurology. Falcone had several explanations for his failure, including the fact that the course was an elective, he was petrified of the babies because they were so fragile, he was intimidated by the faculty, and he felt unprepared for the rotation.

After the hearing, the office of Disability Services sent letters to Falcone's then-current instructors, requesting accommodations in testing, scheduling, and providing extra feedback.[5] COSS eventually informed Falcone that he would be allowed to remain enrolled in the medical school, and that the accommodations as requested in the disability services letter would not compromise the essential elements or objectives of the rotation.

### C. Clinical Medicine IV

The next notable difficulty was in Summer of 1999, when Falcone failed his Clinical Medicine IV rotation. His instructors noted major concerns with his ability to organize and synthesize information, and his tendency to digress when discussing patients.

---

[5] Among other things, the letter specifically requested that Falcone have "access to at least weekly, regularly scheduled feedback meetings with yourself or your designate."

Again, COSS held a hearing.[6] At the hearing, the course director noted that he had not received requests for accommodation until several weeks into the rotation. Falcone testified that he did not mention his entitlement to accommodations until the rotation was nearly complete. He also never informed Disability Services that he was not receiving the requested accommodations.

COSS again determined that Falcone could remain enrolled, and allowed him to retake Clinical Medicine IV because he had not been provided with the requested accommodations. COSS reminded Falcone that "[y]our engagement in this process is necessary to ensure both the effective provision of accommodations and a self-awareness of limitations essential for any physician to treat patients safely." The Committee noted that this was the same message they attempted to convey previously, both at the December 15 dismissal hearing as well as via correspondence.

**D. Emergency Medicine**

In the fall of 1999, Falcone failed emergency medicine. His COSS dismissal hearing was held on March 15, 2000. At the hearing, Falcone complained that he did not receive requested accommodations during his rotation. He specifically identified a failure to provide adequate feedback as a rationale for his failure in the rotation.

Supervising physicians and residents in the emergency medicine rotation evaluate students on a daily basis by use of feedback cards. The cards are completed by the supervisor at the end of each shift. On the card is a section entitled "feedback provided."

[6] This hearing was held on November 17, 1999.

In addition, students are told that they can request more or more specific feedback from the supervisor on a particular shift. Falcone does not dispute that he received those daily evaluations. His complaint is that he did not receive adequate feedback because he was not provided with additional, *formal* evaluations. He points out that he received nothing more than what is provided to all medical students in the emergency medicine rotation.

This time, COSS determined that Falcone could not continue in the medical school. COSS based its decision on two factors: (1) Falcone received appropriate accommodations on the emergency medicine rotation, but nevertheless failed the course, and (2) Falcone was unable to demonstrate, with or without accommodation, that he could synthesize data in a clinical setting to perform clinical reasoning, an essential element of functioning as a medical student and physician.

**E. Additional Clinical Courses**

Falcone was allowed to continue in his courses while COSS's decision and his appeal were pending. During this time, he learned that he had failed Advanced Medicine. He passed Neurology, but the course director noted that Falcone had serious problems during the rotation. For the final exam for Neurology rotation, instead of writing an answer, Falcone wrote, "This exam represents the most boring selection of material I have ever seen."[7] Finally, the instructor for Renal Medicine noted that had a grade been issued, Falcone would have failed the course because he lacked fundamental abilities in

[7] The Course Director noted that such a response would have earned a failing grade for a typical student, but that he chose not to fail Falcone because of Falcone's disability. It is not clear how Falcone's response on this examination is related to his disability.

clinical medicine including an inability to collect, distill, organize, and convey key clinical information.

### F. Medical School / COSS Actions

As noted, COSS dismissed Falcone from medical school following his failure of emergency medicine. Falcone appealed the decision, and it was upheld. The medical school determined that Falcone was unable to adequately synthesize data in a clinical setting, and this inability would compromise patient safety.

## ANALYSIS

### I. Rehabilitation Act

Falcone brings this action pursuant to section 504 of the Rehabilitation Act, which provides that

> No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

To establish a prima facie case of discrimination based on disability in violation of the Act, Falcone must produce evidence that (1) he is disabled as the Act defines that term; (2) he is qualified to remain a student at the medical school ("otherwise qualified"); (3) he was dismissed solely because of his disability; and (4) the school receives federal financial assistance.

For the purposes of this motion, the University concedes that Falcone has established the first and final elements. Therefore, the parties focus on the second and third elements. Specifically, defendant claims that Falcone is not "otherwise qualified"

with or without accommodations, and that he was not dismissed solely because of his disability. Falcone argues that he did not receive appropriate accommodations, therefore the faculty cannot say that he would not be able to meet the minimum requirements, if given adequate opportunity.

Courts regularly apply the academic deference rule to challenges arising under the Americans with Disabilities Act ("ADA") and Rehabilitation Act.[8] *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1028 (8th Cir. 1999) (ADA case); *Wong v. Regents of Univ. of California*, 192 F.3d 807, 817 (9th Cir. 1999); *Wynne v. Tufts Univ. School of Medicine*, 976 F.2d 791, 792 (1st Cir. 1992). *See also Anderson v. University of Wisconsin*, 841 F.2d 737 (7th Cir. 1988) ("The Supreme Court has repeatedly admonished courts to respect the academic judgment of university faculties.") (citing *University of Michigan v. Ewing*, 474 U.S. 214 (1985); *University of Missouri v. Horowitz*, 435 U.S. 78 (1978)). In traditional cases involving academic dismissal and the academic deference rule, summary judgment is appropriate unless there is evidence from which a jury could conclude that there was no rational basis for the decision to dismiss, or that the deicsion was motivated by bad faith or ill will unrelated to academic performance. *Ikpeazu v. University of Neb.*, 775 F.2d 250, 253 (8th Cir. 1985) ("An actionable deprivation in an academic dismissal case is proved only if there was no rational basis for the university's decision, or if the decision was motivated by bad faith or ill will unrelated to academic performance.").

---

[8] The Eighth Circuit has held that cases interpreting the ADA and the Rehabilitation Act are interchangeable. *See, e.g., Allison v. Department of Corrections*, 94 F.3d 494, 497 (8th Cir. 1996) ("Because the same basic standards and definitions are used under [the ADA and the Rehabilitation Act], cases interpreting either are applicable and interchangeable for purposes of our discussion.") (citations omitted).

### A. Otherwise Qualified

"The Supreme Court has interpreted 'otherwise qualified handicapped individual' as 'one who is able to meet all of a program's requirements in spite of his handicap.'" *Beuford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771 (8th Cir. 1987) (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 406 (1979)). If a person can meet the requirements of a program with accommodations, that person is "otherwise qualified." *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir. 1998). Falcone has the burden to establish that he is "otherwise qualified." *Stern v. University of Osteopathic Medicine and Health Sciences*, 220 F.3d 906, 909 (8th Cir. 2000).

#### 1. Requested Accommodations

Since it is clear that Falcone cannot meet the requirements of the program without accommodations, the Court must determine whether any "reasonable" accommodation, that Falcone requested, would have enabled Falcone to meet those requirements. *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 (1987). *See also Ballard v. Rubin*, 284 F.3d 957, 961-62 (8th Cir. 2002) (discussing necessity of express request for accommodation in the typical case) (citing and distinguishing *Bultemeyer v. Fort Wayne Community Schs*, 100 F.3d 1281, 1285 (7th Cir. 1996) (reasoning that where plaintiff employee has mental disabilities and the employer knows the employee needs an accommodation, but does not know how to ask for it, the employer "should do what it can to help")); *Walsted v. Woodbury County*, 113 F. Supp. 2d 1318, 1322 (N.D. Iowa

2000) (reasoning that where it is "common knowledge" that an employee has significant learning disability and cannot read or write, it should be obvious to the employer that employee needs an accommodation, and the employee is not required to expressly request it)).

In this case, Falcone initially requested specific accommodations through the office of Disability Services. However, he did not meet again with Disability Services as he began his clinical training.[9] He has admitted that he did not ask for specific accommodations at that point, because he did not know what to ask for, and because he did not want to self-identify as an individual with a disability. These might be legitimate concerns, but they do not relieve Falcone of his burden to request specific accommodations, or his responsibility to work with the University to ensure that reasonable accommodations were provided. Falcone has the responsibility to put the school on notice that a particular accommodation is needed, and to make a "sufficiently direct and specific request" for a particular accommodation. *Rossomando v. Board of Regents of the Univ. of Neb.*, 2 F. Supp. 2d 1223, 1230 (D. Neb. 1998) (internal quotations omitted).

By the time Falcone took the emergency medicine rotation, however, he had requested specific accommodations. Included in the accommodations request was a specific request for "access to at least weekly, regularly scheduled feedback meetings with yourself or your designate." As noted above, Falcone received daily feedback from

[9] Falcone remembers a conversation with an associate dean, described above, in which the dean allegedly shook her head when Falcone mentioned sending a letter to his clinical faculty. This casual conversation does not amount to a specific request for accommodation.

the various physicians and residents with whom he worked in the emergency medicine rotation, but he did not have a scheduled, formal feedback session with either of the course directors (Drs. Kumasaka and Kilgore).

About two weeks into the emergency medicine rotation, Falcone met with his advisor, Dr. Marilyn Becker. When Dr. Becker inquired into his accommodations, Falcone told her he was not receiving weekly scheduled feedback. This information was apparently conveyed to Dr. Kilgore, who, according to Falcone, took issue with this characterization. Kilgore and Falcone had a confrontation regarding the feedback, or lack thereof. However, the rotation was nearly finished, and Falcone apparently did not receive any additional feedback.

The University's argues that Falcone was provided with his requested accommodation. In fact, the University continues, he was provided with access to more than the "weekly, regularly scheduled feedback meetings" because he received feedback on a daily basis. The University also notes that Falcone did not request that such meetings be automatically established by faculty. Instead, he requested *access* to such meetings, which was provided. Falcone disputes the University's characterization. He argues that the available daily feedback simply cannot be an "accommodation" because it is provided to every student. Falcone also faults his instructors for not taking the responsibility or initiative in setting up those weekly feedback meetings.

The Court accepts neither argument in its entirety. While it is true that disabled students have a responsibility to identify and request specific accommodations, once the student does so, the institution has responsibilities as well. *See Bultemeyer v. Fort Wayne*

*Comm. School*, 100 F.3d 1281, 1285 (7th Cir. 1996) (discussing responsibility of both parties to participate in good faith to determine accommodations). Viewing the evidence in the light most favorable to Falcone, it is relatively clear that he was requesting assistance beyond the cursory feedback provided at the end of each emergency medicine shift. Such feedback was not provided. While the Court is not convinced that an "accommodation" must always be something **more** than what other students are provided, it is fairly clear that Falcone needed, and in fact, requested, more feedback. Viewing the evidence in the light most favorable to Falcone, the Court finds that the University failed to provide this particular accommodation.[10]

Despite this failure to provide feedback, the Court finds no evidence that the University acted in "bad faith." The University provided Falcone with significant and extensive accommodations, even allowing him to repeat several classes (which is against medical school policy). Given these accommodations, and Falcone's poor record, it is difficult to credit any contention that the University acted in bad faith.

### 2. Academic Standards

It is not enough for Falcone to establish that a particular request was requested and was not provided—the University is entitled to summary judgment if the University can show that Falcone is not qualified (because even with the accommodation, he could not

[10] The University makes no attempt to argue that more extensive feedback, such as a weekly meeting with one of the two course directors, would not be "reasonable." Such an argument likely would be unavailing given the fact that the University agreed to the accommodations and agreed that the requested accommodation of "scheduled feedback" would not interfere with the essential elements of Falcone's medical school education.

meet the institution's academic standards). *See Stern*, 220 F.3d at 909 (reasoning that even if University was required to engage in interactive process to find accommodations, plaintiff "nonetheless would have to establish that reasonable accommodations for his disability would render him qualified for the medical school program") (citing 29 U.S.C. § 794(a)); *Wong*, 192 F.3d at 817 (citing *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999)).

The University argues that Falcone's consistent inability to pass courses, both clinical and classroom, demonstrates that he is not "otherwise qualified." Specifically, the medical school found that Falcone lacks the ability to synthesize data as is required in a clinical setting. The Court finds that this characterization is reasonable, given Falcone's entire record in the medical school.[11]

The University points out that despite all requested accommodations, Falcone failed Advanced Medicine, and would have failed Renal Consult, had a grade been issued. In Renal Consult, Falcone did not complain that he was not receiving requested accommodations, in fact, he noted that his instructor "sat down and gave me really useful feedback." Despite this feedback, Falcone did not do well in the course.

In addition, in the classes that Falcone eventually passed, the evaluations he received do not inspire confidence. Falcone's instructors consistently expressed doubt about his ability to work with patients. For example, his psychiatry instructor noted that

[11] Falcone urges the Court to look only at his performance in emergency medicine. However, COSS's decision was based not just on his failure in that rotation, but on his entire record. Nothing in the Rehabilitation Act restricts the Court's ability to review Falcone's entire record, especially when it is clear that the University appropriately relied on his entire record when considering whether he was qualified to remain in medical school.

Falcone's "main area of difficulty is his interpersonal style with patients and colleagues which tends to be not sensitive to the situation and comes across as judgmental." His evaluation from his surgery rotation similarly noted that "all faculty and residents [who] worked with Christopher [Falcone] expressed concern with his ineptitude to relate to patients. The residents and doctors [who] work with Christopher Falcone observed a definite difficulty and inefficient communication with patients."[12]

Many faculty members expressed concern about Falcone's ability to organize and synthesize data. For example, his otolaryngology evaluation noted that "His ability to synthesize the information at hand into a practical, workable plan was lacking." In his Medical Externship, the instructor noted that Falcone "often had difficulty with efficiency, and also with organization and succinct presentation of his write-ups . . . He needs to . . . avoid becoming too entwined in extraneous information." Yet another instructor noted that "His oral presentations were scattered, with too much extraneous details and a lack of focus on major issues." Though this instructor acknowledged that the presentations improved somewhat after feedback, the instructor remained "concerned about [Falcone's] ability to see the big picture and remain focused."

Perhaps more distressing is the concern of Falcone's advisors and mentors that Falcone lacks the self-awareness to realize how his disability impacts his abilities, and

[12] Falcone's inability to interact appropriately with patients evidently does not stem from a disinterest in their care. Indeed, one instructor noted that Falcone "ha[s] a . . . deep, natural caring for his patients." Another noted that "Chris [Falcone] is a student who put forth genuine effort in care for his patients..."

ultimately would affect his patients. Finally, it is impossible to ignore the exceptionally poor judgment Falcone revealed when he refused to write his final exam in Neuroloy.

Though the Court rejects the University's argument that all accommodations were provided to Falcone on the emergency medicine rotation, the Court finds that the University had ample rationale for its determination that Falcone is not "otherwise qualified." It is notable that as Falcone appealed COSS's decision to dismiss him, he argued not that he would eventually be able to perform adequately as a physician, but that he had a "bright future" in "basic research." However, as the University points out, his M.D. would allow him access to all aspects of medical practice. The University cannot restrict his M.D. once it is awarded. The Court is not convinced that the accommodation would have enabled him to successfully complete all the program requirements. Therefore, the University is entitled to summary judgment. *Stern*, 220 F.3d at 909.

**B. Reasons for Dismissal**

Falcone argues that his progress in medical school was impeded by the failure to provide accommodations in his clinical rotations, and that therefore his dismissal was based on his disability. The question is not whether Falcone might convince this Court, or a jury, that he might eventually be able to pass his clinical course. *Anderson*, 841 F.2d at 741. It is whether the University discriminated against him because of his disability—that is, did the University dismiss him even though it would have graduated a student whose academic performance was as poor but whose difficulties did not stem from a disability. *Id.* "Just as Title VII of the Civil Rights Act of 1964 ensures only equal

treatment and not 'correct' decisions, so the Rehabilitation Act requires only a stereotype-free assessment of the person's abilities and prospects rather than a correct decision." *Id.* (citation omitted). Because the Court finds that the University dismissed Falcone due to his inability to synthesize information, as evidenced by his medical school record in its entirety, no rational fact-finder could find that Falcone was dismissed solely because of his disability, and the University is entitled to summary judgment.

**ORDER**

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment [Docket No. 31] is **GRANTED**.

2. Plaintiff's amended complaint [Docket No. 26] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 3, 2003
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge